The next matter on our calendar is United States v. Christopher St. Lawrence. Good morning. May it please the court. Good morning. I'm Michael Burke and I'm here on behalf of Christopher St. Lawrence. Mr. St. Lawrence, who's now 69 years old, was the elected supervisor for 16 years to the town of Arapahoe, one of the largest towns in the state of New York. I can understand. I have to say I find this prosecution remarkable because this country went through a financial crisis in 2008 and Moody's misrated billions of dollars of bonds and people lost millions of dollars and the U.S. attorney couldn't find anybody on Wall Street to prosecute. So they drive up Route 17 and they find your client. If I understand it correctly, your case boils down to whether or not a reasonable fact finder, a reasonable juror, could find that the deficiency, the smaller amount of the general fund should have been properly anticipated. The general fund would have been . . . should . . . purchase of the bond should have understood that the general fund would have been smaller and that you don't think this was material. Is that correct? That's correct, Your Honor, and that's borne out by the fact . . . Could you explain this? Sure. The key issue here on my appeal, there's actually five issues that I raise, but the first issue has to do with the improper, guilt-laden hypothetical questions that the court allowed to go on, that the government continued over and over and over again for the first two and a half weeks, some 20 questions, five different witnesses of the professionals that were involved here. There, the government conflated the two elements that they had to prove beyond a reasonable doubt, both the intent as well as the materiality. And during the sidebars, the government said, well, we're allowed to do that here under this Ferguson case, which was a civil case, that the government's position at that time was, oh, we have to show that it was an intentional lie, and therefore it's material. Well, that's not what the law is, that's not what their burden is, but that was what was allowed for the first two and a half weeks of the trial, where they continued to ask these improper questions. They asked them of Ned Flynn, who was the underwriter in this case. They asked it of Tom Myers, who was the attorney, the bond counsel, who reviewed this. And to your point, Your Honor, you asked, why did you have to go all the way up to the town of Ramapo to find a prosecution? Well, at the Fatico hearing, which is clear here, the government was unable to prove loss because there was not. And the guidelines decreased from 135 months on the low end to 18 to 24 months, where then Judge Seibel upwardly departed from our standpoint wrongfully, because she didn't have a proper basis to upwardly depart, because she said, well, there was more than 10 victims. But as the Court knows, the guidelines say that you had to have a loss in order to be considered a victim. And she said, well, there was victims here, but the government . . . They lost information that they should have otherwise had. Is that your point on the sentencing? That was the Court's point, that they didn't have . . . but that gets us back to what did the jury determine as to material information. And what Belcher, who was the one witness when the light finally went on, I was objecting all throughout the trial, where the judge said, wait a minute, something's going wrong here, I need to address this, and I'm going to move to strike the prior testimony with the curative instruction. However, Your Honors, that was far too late. The damage had been done, it was incurable, it was terminal, and the Court should have granted a mistrial at that time. You look at the delays and . . . What was the damage? The damage was that the jury continued to hear about my client lying and that that information was important to them. So that's how the hypothetical was posed over and over again, which was an improper hypothetical. The government's whole theory was that your client was lying. Correct. But how did that increase . . . how was that prejudicial, if it was simply consistent with the government's theory that it was trying to prove? Because what they were doing in that, Your Honor, was that they were using both elements of materiality and specific intent in a hypothetical question that was improper. And when the jury, all the juries, one of the jurors that was interviewed afterwards, which gets to my . . . Rather, the impropriety in the question was that the assumption that your client had lied. Correct. The guilt-laden . . . If it was just asking about whether this kind of information is material, that would be okay. That would be okay, but it's the fact that you import into the question, if Mr. St. Lawrence intentionally lied to you, would that make a difference? So that there, you have the intentional lying component, and we moved in Lemonade to preclude just exactly what happened. Improper hypothetical questions that came before this jury, and the judge allowed . . . Wasn't Judge Seibel's curative instruction sufficient? Because one, it wasn't prompt. It went on for two and a half weeks. So we look at, it was some 336 hours after Ned Flynn's first improper question, 192 hours after the improper questions to Tom Myers. And the courts clearly say that a curative instruction has to be given promptly. In the cases I cite, that within 24 hours, that's too long. Within 20 minutes, that's too long. Here, we had far longer than that, that these improper questions weighed on the Mr. St. Lawrence lied, but no one lost any money. All the bonds have been paid. No money went to Mr. St. Lawrence. So what are we talking about here? We're talking about lies. And that's their whole case as to whether they were material or not. And these questions were conflated into one improper question that was asked over and over again, tainting the jury. And that taint, Your Honor, as I said, there was no cure. The only cure would have been a mistrial. Wasn't there evidence that because of the misallocation of funds within the accounts, that the town of Ramapo paid a higher interest for the bonds? Isn't that part of what the government claimed? I don't know. Misallocation of the funds. Mislabeling them, the FEMA funds and the other funds. Wasn't there an allegation that that cost the town? Well, Your Honor, the town, the interest rates that were returned by the town were tied into the Moody's rating. Moody's rated it as an A1 negative. The FEMA receivable that was referenced was explained as a estimate. So the town didn't pay a higher interest rate, if I understand the Court's question. The town wasn't paying a higher interest rate on the bonds for that specific bond that dealt with the FEMA. Now, there were, there was a precautionary language where they had to pay because the government executed a search warrant and they were going out to bond. They had to pay a higher rate then. Just because of the search warrant? Yes, because now the underwriters say, well, if you want to go out and borrow money to complete your projects, you're going to have to pay a higher interest rate because there's a greater concern. There's a concern about the bookkeeping methods, the accounting methods, right? No, there was a concern because the government felt in May of 2013 to execute a search warrant at the town of Aramco along with, you know, it being broadcast through the local news media, etc. The investigation itself was the cause of the higher interest is what you're saying? The investigation was one of the things that was referenced in the official statement in the May of 2014 and May of 2015 bond offerings where it was putting the investors on notice, hey, there may be issues here. The government's saying and the SEC is saying that they believe that there was bookkeeping issues. However, from our standpoint and from the standpoint of the accountants, the outside auditors who reviewed the books and records, they made a determination that the general fund, which is just one of the many funds that are factored in. But to your point, Your Honor, Judge Eaton, the investors look at the full faith and credit of the town of Aramco as to be able to pay back those bonds. That's the primary focus of, are they able to pay them back? So the GEO pledge is, we'll raise our taxes enough to pay off these bonds? Correct. They have the full taxing authority to pay off those bonds and that's what makes them so secure. That's why there haven't been, there's no default. They got what they bargained for. Any of the information that the government continued to pinpoint here was not material to the determination of the investors. And they didn't hear from any of the investors. So for Judge Seibel to find that there was 10 or more victims, there was two that they heard from Dan Belcher, who was one of the financial advisors. So when I said they didn't hear, they didn't hear any specific investors. And when we went through that Fatico hearing where they called the SEC expert, they were not able to prove that after the market learned of this information, whether it had an effect on the bonds. In fact, a number of them, a fair number of them went up where they were making more money. So because there was all these different issuances, Your Honor, they couldn't prove loss. They couldn't prove victims. This case should be reversed and returned back down to the district court for a retrial and resentencing or a resentencing. Your Honor, the last point I want to talk about is the jury misconduct. You have two minutes for rebuttal. Do you want to use it now or? I will. I just briefly. Yes, I do. We've read your papers. Okay. I think that it was important here, Your Honors, that Judge Seibel had the opportunity and we presented the case to her to say, we've been informed that there was jury misconduct here. We've gotten information from the reporter and I'm bound by Federal Rules of Evidence 606B, the no impeachment rule, that I'm not to then go out and try to interview. I asked the court to conduct a hearing. She chose not to. But the information that was there, and just to give you a sense of the town of Ramapo, there is a large Hasidic community there. That was Mr. St. Lawrence's voting block. That did not come before the trial at all. There was no evidence as to that. But there were grassroots organizations that disdain Christopher St. Lawrence and have issues with the expansive Hasidic community in the town of Ramapo. This information came into the jury room and one of the jurors said, hey look, jurors came back in and during deliberations they said, we believe he's protecting the Jews. That improper bias should have been further explored, but the court decided not to even conduct a hearing. And I point to the Peña Rodriguez case, the recent case in 2017 from the Supreme Court, which talks about that Rule 606B, the no impeachment rule, must give way when there's issues of a fair trial. And here, 606 must have given way because there was clearly biased information in relation to bringing information about Mr. St. Lawrence's relation to the Jewish community that was his supporting block. And they considered that unfairly and did not give him a fair trial. Thank you, Your Honor. Thank you. I'll let you keep a minute of rebuttal. Thank you. Counsel? Good morning. Let's start where we ended with Mr. Burke. Who were the victims? The victims, Your Honor, were the investors who bought bonds issued by the town of Ramapo Didn't they get a higher interest rate? They got a lower interest rate than they were entitled to because Mr. St. Lawrence inflated the key financial metric for municipal bonds. Where do you find that on the record? Where is that proven? Who found that, that they would have gotten a higher interest rate if this information had been known? Mr. Flynn, who was the underwriter on the bonds. He said this. Yes, he did. But it was, is there, it was proven? How? The FATICO, when you had the FATICO hearings, you couldn't demonstrate that there was any financial loss to the people who bought the bonds. We couldn't quantify the loss in the FATICO hearing. Judge Seibel did find expressly on the record that there was a loss, that it would be. She found there was a loss of information. No, she also found that there was a financial loss, but that we weren't able to quantify it. How much it was. No, we were not able to quantify it. But she did find that logically there was. It could have been a penny. You don't have any idea how much the loss was? No, it would have been more than a penny logically. You don't know that? I can't put a figure on it. Nobody knows that. You're right. I can't put a figure on it. I wasn't able to put a figure on it at the FATICO. Explain how the loss were, how, how, how they lost a return on investment. The defendant, Mr. St. Lawrence, inflated the general fund balance. And that is the key financial metric of the town. The general fund in Ramapo, as in most towns, is the primary fund. It's the largest fund. And it is the one that investors and bond analysts look to, to determine the financial health of the town. Okay. So they inflated that. Yes. And what did that do to the investors? As a result, when the bonds, when the bonds are issued, Mr. Flynn testified that they go through a process by which they set the initial interest rate. And they, they speak to others in the marketplace and say to them, and just ask their opinion as to what the bonds are worth based on the financial information, including the general fund balance that's been published by the town to the market. And based on that, they set an initial interest rate. Once the bonds are issued and start trading, the yield on the bonds changes based on the, the financial condition of the town as it is reported over time. Much the same way that a common stock of a corporation will change in price based on earnings information that is released by the corporation. Okay. And what did the Moody's, the Moody's analyst, to give a percentage of the, when they're, when they're rating these bonds, to say how important, say the, the tax base of the, of town of Ramaphosa was to rating the bonds? What percentage did the Moody's analyst give? She did not put a percentage on it. She said 40%. Yes. And you asked, how much do you put on the funds total? And she gave an answer. And the answer was 10%. So you may represent that somehow or another, these funds were of overwhelming importance to the rating of the bonds or to the purchase of the bonds, some of whom, by the way, are qualified investors. But I'm not, I don't think that you proved that. Did you prove that at the time? Yes. Yes, we did. Yes. We proved that these misstatements were material. They inflated the general fund balance, which, which the Jeffries witness, Mr. Flynn, which both Moody's witnesses testified was the key financial metric that investors and analysts looked to. We had two- They didn't testify on general obligation bonds that it was the key. They testified it was the primary metric that was looked at. In addition, we brought in two investors who also said, who bought these bonds, who said the same thing, that they looked at two things. They looked at the general fund balance and how it changed over time in the town. And they also looked at the Moody's rating. But the Moody's rating was based primarily, as the two Moody's witnesses testified, on the general fund balance and trends in the changes of the general fund balance. The general fund balance was the single primary, most important financial metric of that town. And that is logical. And did the yield on these bonds go down? The, the, well- Has the general fund, to use your analogy of a, of a stock traded on the NYSE, when, when it became known that the general fund had less or more money, did the yield on the bonds change? We did, we did not prove that on the Fatico, but what the record does contain is that in became public, the initial interest rate that was set on the bonds went up. If you look at the initial interest rate on the bonds issued in late May 2013, two weeks after the search, they had to pay a higher initial interest rate in order to sell these bonds. So the investors benefited, but the town lost? The town lost, yes. But, but, but the investors, those investors did not get the full benefit that they were inflated by over $6 million. The investors did not know the truth. They did not get the truth that they were entitled to get under the Federal Securities Act. So when the truth came out, the value of these bonds plummeted? We weren't able to prove at the Fatico that the value of the bonds changed. But we were able to prove that those things were, and the reason why, as Judge Seibel did say on the record, is because the trading data on these bonds was, one, somewhat limited, because these bonds don't trade like, you know, Microsoft, obviously, and secondly, that the trading data was simply just all over the place. It was very difficult to interpret and see a trend coming out of that. So that's why she said, look, logically, there would be a loss here because these investors were deprived of material information about these bonds that would, and the town would have had to pay a higher interest rate, logically, to sell these bonds. But once the information was known to the public that had been previously denied to them, logically, the bonds would have lost value, particularly if this information was material. Yes. I agree with that. I agree with that. But it didn't happen. We couldn't prove that it happened. We couldn't prove that it happened because people weren't trading the bonds all that often. There wasn't sufficient, as Judge Seibel found, sufficient trading data for us to look at and say, all right, these bonds, the value of the bonds has gone down and the yield on the bonds has gone up. But logically, that's what happens. The same as if, you know, Microsoft inflated its earnings, obviously, the value of Microsoft stock only happens if the information is material. But here it was material because if you, in each case where Mr. St. Lawrence inflated the general fund balance, he changed the balance from a negative balance to a positive. He made it appear that the reality was that the town was in the hole. The general fund was in the hole by millions of dollars. What's the definition of material? What a reasonable investor would find important in making an investment decision. But once the information was known, you could not demonstrate that a single investor changed his, sold his bonds at a loss, priced them differently in his financial statement. You couldn't prove that. So why is this information material? It is material. Well, first of all, the reason why we couldn't prove it is because there wasn't sufficient trading data because investors held the bonds to maturity, all right? But they still did not get the interest rate that they were entitled to all along. And it is material because if you change, you're changing a key financial metric. Instead of saying we're making money in the town of Ranopo, the town of Ranopo is spending money wisely. You're losing money. It's only material if it affects the behavior of investors. No, it's material. It's material if it would be important to the investor. Yes. And it would only be important to the investor as to whether or not to buy or sell the bonds. In making, or to keep them. Or to keep them. Or to keep them. And that's what we showed, that it was important to an investor. We brought two investors in who testified that this would be important to them. Also, Ned Flynn, the underwriter on most of these bonds, testified he spoke with investors all the time in a 20-odd-year career, and that the general fund balance was material to that. And that changing a general fund balance from a negative to a positive would be material. That's why Mr. St. Lawrence did it. He put money into these bonds. On a different note, what was his motivation here? I mean, the government didn't have to prove motive, but why was he doing this? He wasn't putting money into his own pocket. No, he wasn't. The fraud started in 2011 when Mr. St. Lawrence decided that he wanted to build a minor league baseball stadium in Ramphill. And he started building the stadium before he had the money to do it. He cleared the land, and he started the construction that winter, before he had any money. He then did, in April of 2011, a $25 million bond issue to start paying for the stadium, which ultimately cost $60 million. At that time, the general fund balance was a negative. And we knew, or he knew, that he would not be able to sell the bonds. Ned Flynn, the underwriter on those very bonds— The bonds, the $25 million bonds? The $25 million bonds. Ned Flynn, the underwriter on those bonds, testified that it would have been very difficult to sell them if the town had a negative general fund balance. As a result, Mr. St. Lawrence inserted a false receivable into the general fund to change the general fund balance from a negative to a positive. Once he did that, it's like—it's called, in accounting, accrual drugs. Once you do that, once you commit fraud, you have to keep committing fraud, because you have to—otherwise, you'll dig yourself into a hole. I see my time is up. The motivation was he wanted to see the park built. Yes, he very much wanted to see this built. The testimony was that during construction, he went to the stadium every day. It is an odd case to go after someone criminally, if that's the motivation. Well, the reason why we did this is because there's very little regulation of the municipal bond market. The only—of all the SEC regulations, the only ones applied are the direct anti-fraud regulations because of Tenth Amendment concerns. And as a result, where you see a fraud like this, where someone is blatantly defrauding investors by changing the one single key metric in the town, we thought it was an appropriate case to bring. But you brought a civil fraud case against Mr. St. Lawrence? But the SEC did bring one, yes. And? He settled it. Thank you, counsel. Your Honor, I just want to correct one last piece of information the government referenced as far as settling the civil SEC enforcement action. The SEC moved for summary judgment based on collateral estoppel from the underlying conviction, so there was no settlement. There was a motion for summary judgment where he was found based on collateral estoppel. Judge Seibel, who also had the criminal trial, found that a fine was inappropriate and exacted a $327,000 fine on top of the upward departure of 30 months for the criminal sentence and a $75,000 fine. But to your point, Your Honor, Judge Eaton, had this been a private civil action, the plaintiff would have had to prove loss, which the government wasn't able to do here. This would have been dismissed at summary judgment. So this wasn't an appropriate case to go after. It is an odd case criminally and should have never been brought in the first place. Judge Eaton, you made a point, and I think it's a very good one, as to the matrix that The general fund was a 10 percent point that they relied on, and even when there was a negative general fund balance, they didn't change the Moody's rating, which is the primary factor in setting what the interest rates are. So when Moody's had- Do you agree that the balance in the general fund is important to investors? I wouldn't agree that that was the only important factor. Would you agree that it is an important factor? I wouldn't, Your Honor, in the sense that with Moody's, it wasn't an important factor when it was negative. They didn't change their rating. Just as a matter of common sense, if a member of the public is thinking about investing in municipal bonds, they'd want to make sure that they'd be interested in what the balance of the general fund was. I think they want to know if they're going to get their interest return, and if it's going to be paid, and if they- That would be impacted by the balance in the general fund. It wouldn't in this instance because they could always raise taxes. It's not the corporate instance where you have to rely on the sale of widgets. As a matter of common sense, it does seem that that would be a material piece of information, what the balance of the general fund is. Your Honor, I think that it depends on the investor, the sophistication of the investor. These were all sophisticated financial investors in the bond industry. In this case, this issue, whether it was material, was put to the jury. Materiality was put to the jury. The jury found materiality. The jury found that certain information was material, yes, Your Honor, and that's why he's been convicted. He was not convicted of the two counts that relate to the $25 million for the stadium. To answer your question about motive, the government didn't even prove that because the jury came back on those $25 million bonds and found him not guilty. Thank you, Your Honors. Thank you both. We'll reserve decision.